**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION**

**MICHAEL HERBERT JOHN NEWMAN**                                          **PLAINTIFF**

**V.**                                 **CASE NO. 3:19-CV-03092**

**CORPORAL ETHAN RAYMOND, Baxter
County Detention Center (BCDC);
OFFICER DAWN DUNFORD, BCDC;
SERGEANT TONY BECK, BCDC;
and NURSE SIERRA HOLLIS, BCDC**                                 **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This is a civil rights action filed by Plaintiff Michael Herbert John Newman pursuant to 42 U.S.C. § 1983.   Newman proceeds *pro se* and *in forma pauperis.*   While he was incarcerated in the Baxter County Detention Center ("BCDC"), Newman maintains that his constitutional rights were violated in two ways: (1) when he was denied medical care, and (2) when excessive force was used against him on July 26, 2019.

Pending before the Court are a Motion for Summary Judgment (Doc. 40) and Supplements (Docs. 48–49) filed by Defendants.   Newman filed a Response in Opposition (Doc. 44).   For the reasons explained below, the Motion is **GRANTED IN PART AND DENIED IN PART**.

## I.   BACKGROUND

Newman was incarcerated at the BCDC on June 26, 2019, on a parole violation charge.   He was later charged with impairing the operation of a vital public facility, disorderly conduct, aggravated assault on a corrections officer, and terroristic threatening. These new charges arose while Newman was incarcerated at the BCDC pending transfer

1

to the Arkansas Division of Correction[1] ("ADC") on September 11, 2019.

## A.   Medical Care

Newman maintains that he was suffering from a mental illness at the time he entered BCDC custody on June 26, 2019.  (Doc. 42-8 at 20–28).  He testified at his deposition that he had been diagnosed with schizoaffective disorder in 2011 or 2012.  *Id.* at 20–22.  He experienced hallucinations, heard voices, and suffered panic attacks as a result of this illness and was treated with both medication and electroconvulsive therapy. *Id.* at 22. On the date Newman entered BCDC custody, he had prescriptions for Zoloft and Prazosin.  *Id.* at 70.

Newman alleges that from at least July 21, 2019, to September 11, 2019, he reported to BCDC staff that he was suicidal.  He believes he should have been placed on "suicide watch," which to Newman meant requiring him to dress in a "turtle suit, like a green suit to where you can't hang yourself" and then placing him in a special cell and performing wellness checks every ten or fifteen minutes.  *Id.* at 34-35.  Newman testified that instead of being placed on suicide watch, jailers placed him in a "detox cell" and then moved him to a "camera cell."  *Id.* at 34.

According to Jail Administrator Brad Lewis, the BCDC provides medical care through licensed medical personnel.  Specifically, Administrator Lewis indicates there is "one APRN [Advanced Practice Registered Nurse] who works on a part time basis and

---

[1] The Arkansas Department of Correction was reorganized in 2019 to become the Arkansas Department of Corrections.  The new Department is a Cabinet level department within the Arkansas State Government which includes the Division of Correction and the Division of Community Correction.

who is regularly available in person at the Detention Center to see jail inmates each week." (Doc. 42-1 at 2). Unless the situation is an emergency, an inmate will be required to fill out a medical request form to obtain professional medical care. *Id.*; *see also* Doc. 42-7 at 1–6 (jail medical policy). If an inmate needs mental health care, however, it is BCDC policy to refer the inmate to an outside provider, Ozark Guidance ("OG") for treatment. (Doc. 42-1 at 2). Inmates may communicate "their mental health care requests to jailers, deputies or medical staff, who will be responsible for documenting the request in the appropriate manner to include specific details." *Id.* An inmate with suicidal tendencies "shall be confined in a security holding cell. If an inmate is deemed to be suicidal, then all clothing should be removed from the suicidal inmate, and a suicide smock should be provided instead." *Id.* at 2–3. If an inmate has a "history of suicide attempts or threats," the inmate "will be placed in a single-cell, high-supervision housing regardless of their security score pending further review and evaluation by mental health staff." *Id.* at 3; *see also* Doc. 42-7 at 7–9 (mental health policy).

On June 27, 2019, Newman submitted a grievance indicating that he needed to go to a hospital to get his mental health medications. (Doc. 42-3 at 2; Doc. 49-1 at 1). He claimed that even when he asked the jail nurse to help him, she was unable to fill his medications. Separate Defendant Nurse Sierra Hollis submitted an affidavit explaining that she is a Licensed Practical Nurse ("LPN"). (Doc. 42-10 at 1). She states that according to jail policy, any detainee "with a history of suicide attempts or threats will be placed in a single-cell, high supervision housing . . . pending further review and evaluation by mental health staff." *Id.* According to Nurse Hollis, Newman was placed in the detox

3

cell located in the booking area "so jailers and others (including [her]self) could perform more frequent wellness checks on him due to his statement that he was suicidal."   *Id.*

The BCDC's records indicate that on Monday, July 1, 2019, Nurse Hollis was informed that Newman had defecated on the floor and on a food tray over the weekend. (Doc. 42-6 at 2).   She noted in his file that his toilet was completely full of trash, wrappers, and toilet paper and that his "room smell[ed] awful."   *Id.*   Because of "Newman's odd behavior, assertions of mental health issues, and his allegation that he was suicidal," Nurse Hollis claims she "personally called the Community Mental Health Service provider, [OG], and asked them to come to the jail and speak to Newman to determine if he needed other services."   (Doc. 42-10 at 2).   OG staff member Jessica Vrellaku visited the jail that same day to assess Newman.   *Id.*   During this evaluation, Newman's suicidal thoughts were assessed as being "mild (weekly or less)," and he was not considered to be at risk of self-injury.   (Doc. 42-4 at 4).   Ms. Vrellaku also concluded that Newman was not a good fit for inpatient care at that point in time.   *Id.*   Instead she recommended that Newman be brought to OG to be seen by an APRN about his medication.   *Id.*

On July 3, 2019, Nurse Hollis noted in Newman's file that she had advised Vrellaku that Newman was taking Zoloft and Prazosin.   (Doc. 42-6 at 2).   Nurse Hollis further noted that Newman had been refusing his "Zoloft every morning."[2]   *Id.*   On July 11, 2019, a note was made in Newman's jail file that OG had been contacted to set up an appointment to see Newman the following week.   *Id.*   On July 14, 2019, Newman reported hearing voices, having nightmares, and being off his anti-psychotic medications.

---

[2] No medication log is contained in the summary judgment record.

4

(Doc. 42-3 at 3).   Newman stated in a grievance that he told the jail nurse and Sergeant Tony Beck about these problems, but they did nothing to assist him.   *Id.*

On July 21, 2019, Newman complained in another grievance that he had been hearing voices and did not have his "anti[-]psychotic medicine or [his] mood stabilizer." (Doc. 49-1 at 4).   On the same date, Newman filled out an inmate medical request listing his pharmacy as Walgreens and indicating that his current medications were Zoloft and Prazosin.   *Id.*   He also wrote on the form that he needed his medication and group counseling and was suicidal and psychotic.   *Id.*   Along the bottom of this form, jail medical staff wrote:   "Will be seeing Ozark Guidance today 7-24-19."   *Id.*

Newman was taken to OG on July 24, 2019, to be evaluated by Dr. Berke.   (Doc. 42-9 at 17).   Dr. Berke noted that Newman had a history of "being very manipulative, oppositional, demanding and conning at the jail."   *Id.*   She also noted that Newman was not communicating in a logical and coherent manner the day of the visit and that it was difficult to fully assess his risk of self-harm.   *Id.* at 18.   When she questioned Newman about thoughts of killing himself, he made "paranoid and delusional" statements.   *Id.*   Dr. Berke concluded that his overall risk rating was low.   *Id.* at 19.   Her specific medical diagnoses were schizoaffective disorder, bipolar, and antisocial personality disorder.   *Id.* at 22.   She determined that the appropriate treatment was medication management, and she prescribed the drugs Depakote, Seroquel, Zoloft, and Prazosin.   *Id.* at 27.

Newman did not specifically recall being screened by Dr. Berke on July 24.   (Doc. 42-8 at 30).   However, he did recall going to OG on one occasion with Nurse Hollis, which he agreed was likely on July 24.   *Id.* at 30–31 & 46.   He remembered that OG staff had

decided that it was not necessary to hospitalize him at that time, but that he had disagreed. *Id.* at 31.

On August 5, 2019, Newman completed another inmate medical request. (Doc. 49-1 at 6). He listed his current medications as Depakote, Zoloft, Seroquel, and Prazosin. *Id.* He claimed that he was still hearing voices and hallucinating. *Id.* He also indicated that he had yet to see a psychiatrist and needed his medication "figured out." *Id.* On August 13, 2019, OG records indicate that Advanced Practice Nurse ("APN") Whitney Reed screened Newman. (Doc. 42-9 at 25). She noted that Newman's primary complaint was that he was still hearing voices. *Id.* Newman reported being satisfied with his current medications, Depakote, Prazosin, Quetiapine (Seroquel), and Sertraline (Zoloft). *Id.* at 27. APN Reed concluded that Newman was not a danger to himself or others. *Id.* at 30. She increased his Seroquel and Prazosin dosages and continued the Depakote and Zoloft. *Id.*

Newman filed another grievance on August 20, 2019, claiming he was psychotic and suicidal. (Doc. 49-1 at 8). He submitted yet another medical request form on August 31, 2019, claiming he was hearing voices, was suicidal and homicidal, and was having "really bad panic attacks." *Id*. at 10. He indicated that he knew "the police [were] trying to kill [him]." *Id.* On September 6, 2019, Newman submitted a final grievance about his mental health. *Id.* at 11. He once again indicated he was hallucinating and hearing voices, that he was suicidal and homicidal, that he did not have the right medication, and that the nurses and Sergeant Beck were aware of the problem but had done nothing. *Id.* He was transferred to the Arkansas Department of Corrections five

days later, on September 11, 2019.

In addition to the above allegations concerning the jail staff's treatment of his mental health concerns, Newman claims he was denied appropriate medical care for physical injuries he suffered when he was extracted from his jail cell on July 26, 2019. (Doc. 42-8 at 33 & 51).   He believes he suffered a severe concussion and that the officers involved should have taken him to see the nurse immediately.   *Id.* at 53 & 62.   Instead, two to four days after the incident, he told Nurse Hollis and APRN Clifton-Jones that his head was "throbbing and hurting" and "had a big, old lump on it."   *Id.* at 56 & 62.   He also claims he told them that his leg was bleeding from the areas where taser prongs had been removed from his skin.   *Id.* at 56, 61–62.   Newman complains that the medical staff's response to these physical injuries should have been "a little quicker" in light of the "severity of the incident."   *Id.* at 61.   But he also agreed that he was examined approximately three or four days after he was injured.   *Id.* at 63.

Newman blames Officer Dunford and Corporal Raymond for failing to take him to receive medical care immediately after the jail-extraction incident on July 26.   As for Nurse Hollis, Newman agrees she did not know he needed medical care on July 26, so he cannot "hold [Nurse Hollis] as being deliberately [in]different."   *Id.*   Nurse Hollis claims that she was not even present at the BCDC on July 26, but that she returned to work on July 29 and placed Newman on the medical list.   (Doc. 42-10 at 3).   She maintains that she did not observe any injuries on Newman on July 29.   *Id.*   On August 1, Nurse Denise Clifton-Jones evaluated Newman for injuries he claimed he suffered after an altercation with officers.   (Doc. 42-4 at 5).   She indicated that Newman was

7

complaining of "forehead pain." *Id.* However, upon examination, Newman was awake, alert, and oriented, his speech was clear, and he was coherent. *Id.* She evaluated Newman again on August 6 in response to "another sick call request." *Id.* Newman reportedly had normal ambulation, good coordination, clear and coherent speech, clear thought processes, and equal pupils. *Id.* Nurse Clifton-Jones offered him Tylenol for headaches, but he declined. *Id.*

## B.  Use of Force

With respect to Newman's excessive-force claim, Officer Dunford filed the following report on July 26, 2019, at 9:45 a.m.:

> I Jailer Dawn Dunford Bx 40 was in booking after doing a female check and speaking to a female that was on the bench and as I was walking around the booking counter inmate Newman, Michael 19890729 booking number 201912292 had a st[y]rofoam cup and he threw the liquid at me covering my left shoulder and down my left arm. I made the comment thank god that was water the female on the bench said no Miss Dawn that was colored. I then smelt the sleeve on my left arm and it was definitely urine. Cpl. Raymond was in booking at the time and witnessed this incident. I have spoken to Capt.[]Lewis and I will be charging this inmate with Assault on an officer and impa[i]ring op[]erations. There was no reason this inmate should have been upset with me I had not even spoke[n] to him this morning. This incident was unprovoked by me in anyway. This can be[] seen on booking #1 camera at 8:49 am.[3]

(Doc. 42-6 at 2); *see also* Doc. 42-11 at 1–2 (affidavit of Officer Dunford).

Corporal Raymond also prepared the following report about the incident:

> On July 26, 2019 at approximately 8:58 a.m., I, Corporal Ethan Raymond, was speaking with Jailer Dawn Dunford at the booking desk when Inmate Michael Newman threw the contents of a cup that appeared and smelled of

---

[3] No video was submitted to the Court; however, it is undisputed that Newman threw urine on Officer Dunford.

urine out of his food port[4] which landed on Jailer Dunford and the surrounding area of the booking desk.   The food port flap was immediately shut by Jailer Dunford to prevent Inmate Newman from throwing more items out of his cell.

On July 26, 2019 at approximately 11:00, I, Corporal Ethan Raymond along with Deputy Michael Foster and Jailer Dunford placed the restraint chair in front of Detox to put Inmate Newman in, due to him kicking his cell door and slamming against it.   Deputy Dan Isbell opened the door to Inmate Newman['] s room in which I entered followed by Deputy Foster.   When I entered the cell, Inmate Newman then tossed the contents of a cup into my face and into my mouth and eyes.

I then secured Inmate Newman to the wall.   I then placed him on the ground and ordered him to get off his hands in order for me to handcuff him. Inmate Newman did not comply and continued to fight in order for me to get his hands from underneath him.   Inmate Newman gained compliance from two cycles of 5 seconds with a Taser from Deputy Foster and I placed him in the restraint chair.   I and Deputy Foster went to Baxter Regional Medical Center to be evaluated, due to the contents of the cup that Inmate Newman threw at us.

(Doc. 42-5 at 2–3); *see also* Doc. 42-12 at 2–3 (affidavit of Corporal Newman).

Corporal Raymond maintains that once Newman was in the restraint chair, "Newman stated that he would kill us.   I asked him if he stated that he would kill us and Newman responded, 'no, I won't kill ya'll, I will kill your kids and family.'"   (Doc. 42-12 at 3).

Deputy Foster[5] submitted a supplement to the report that provides as follows:

On 7/26/19 at approximately 11:00 A.M. I, Deputy Michael Foster BX 28

---

[4] Referred to as a "bean hole" in other places in the summary judgment record.

[5] Deputy Foster was originally named as a Defendant.   However, service was returned unexecuted from the BCDC because he no longer worked there.   (Doc. 9).   The unexecuted return noted that it was believed Deputy Foster had moved to Nashville, Tennessee.   Plaintiff was then directed to provide the Court with a service address. (Doc. 11).   Plaintiff was unable to provide the Court with the necessary information to perfect service on Deputy Foster, so he was terminated as a Defendant.   (Doc. 16).

was called downstairs into the booking area of the jail to assist with an out of control inmate Michael Newman.   As I arrived downstairs, Corporal Raymond was getting the restraint chair.   Jailer Dunford was down there along with Reserve Deputy Dan Isbell.   Deputy Isbell stood behind the door to unlock it, Corporal Raymond and I made entry.   Newman instantly threw a cup full of urine and possibly semen in Corporal Raymond's face.

As I made entry into the cell, Corporal Raymond had Newman up against the wall and then went to the floor.   While on the floor, Newman continued to actively fight, refusing to give up his hands and Newman was trying to kick us.   Corporal Raymond had Newman in a head lock and was giving him commands to give us his hands.   Newman continued to fight and disregard the commands given.   To control Newman, I drive stunned him in the left leg with the Taser 2 times, 5 second cycles each.   (Taser is a non-lethal method to control a person.)   Once Newman gave me his left hand, I handed the Taser to Jailer Dunford and handcuffed Newman behind his back.   Corporal Raymond and I placed him in the restraint chair.   After Newman was placed in the restraint chair, he started stating he would kill us.   When Corporal Raymond asked if he said he would kill us, he changed his mind and said, "no I won't kill ya'll, I will kill your kids and family."   He directed that towards Corporal Raymond, Jailer Dunford, Deputy Isbell and myself.   We left Newman in his cell for observation and realized how much urine was on us.   Corporal Raymond had urine all over his face, hair, inside his mouth, along with the front of his shirt.   I had urine on my shirt, face, hair and inside my mouth.

After cleaning up, we spoke to Captain Lewis BX-2 and informed him of the situation.   We then went to the Baxter County Regional Medical Center (BRMC,) to be evaluated.   We are unsure if Newman has any sexually transmitted diseases.   BRMC took several blood samples.

(Doc. 42-5 at 3).

By affidavit, Officer Dunford asserts that she did not enter Newman's cell on the morning of July 26, 2019, after he threw urine on her.   (Doc. 42-11 at 2).   She maintains that she was not involved in the cell extraction and has no personal knowledge of what occurred when he was removed from his cell.   *Id.*   Newman admits that prior to the cell extraction, he had been saving up two cups of his own urine.   (Doc. 42-8 at 52).   When Jailer Dunford told him to quit kicking his cell door, he opened the food port and threw a

10

cup of urine on her through the port.   *Id.* at 50.   He also warned the other officers that if they entered his cell, he was going to throw urine on them, too.   *Id.*   He testified that once his cell door opened, "about three or four officers came in."   *Id.*   He claims Corporal Raymond was the first officer to enter the cell, and Newman "threw [the cup of urine] in his face and then caught the wall."   *Id.* at 51.   Newman then claims that he "turned around, [and] put [his] hands behind [his] back," but Corporal Raymond proceeded "to throw [Newman] on the ground, and then when he got on top of [him], [Corporal Raymond] beat [him] in the top of the heard for a good minute and a half."   *Id.* Newman believes that Officer Dunford tased him twice in the leg "while [he] was laying face down on the ground getting beaten at the top of the head."   *Id.*   However, he acknowledges that he is not certain Officer Dunford is the person who tased him.   *Id.* at 55 & 57.[6]   Newman agrees he was then placed in the restraint chair, and the cell door was shut.   *Id.* at 51.   He acknowledges that his face was not injured and that he had no marks on his neck.   *Id.* at 58.   He claims that he "didn't resist at all" after he threw urine on Corporal Raymond in the cell.   *Id.*

Newman submitted a grievance about the July 19 incident on August 6, 2019. (Doc. 49-1 at 7).   He indicated that he had been beaten unconscious and tased when he had not been resisting.   *Id.*   The signature of the responding officer is illegible.   *Id.*

According to Administrator Lewis, BCDC policy provides that "jail officers will use the minimum amount of non-deadly force necessary to maintain the security and control

---

[6] Newman testified: "Yeah.   I know somebody used it.   I don't know who it was, though. I couldn't really turn my head."   (Doc. 42-8 at 57).   He also wondered in his deposition whether "Raymond was the one that tased [him]."   *Id.*

of inmates, and to prevent incidents from escalating into an emergency. . . . Examples of the type of behavior that may justify the use of non-deadly force" include "when [an] inmate is assaulting, or appears likely to assault, another inmate or officer."   (Doc. 42-1 at 3).   All instances of the use of force are to be documented "on an official incident report immediately."   *Id.*; *see also* Doc. 42-7 at 10–13 (use-of-force policy).

## II.   LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita*, 475 U.S. at 586.   "They must show there is sufficient evidence to support a jury verdict in their favor."   *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."   *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version

of the facts for purposes of ruling on a motion for summary judgment."   *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.  DISCUSSION

As set forth above, Newman has asserted a denial-of-medical care claim and an excessive-force claim.   Defendants maintain they are entitled to summary judgment for the following reasons: (1) they were not deliberately indifferent to Newman's serious medical needs; (2) the amount of force used against Newman was objectively reasonable in light of the circumstances; (3) Defendants are entitled to qualified immunity; and (4) there is no basis for official-capacity liability.

### A.  Denial-of-Medical-Care Claim

Jail officials violate the Due Process Clause of the Fourteenth Amendment when they exhibit deliberate indifference to a pretrial detainee's objectively serious medical needs.[7]  *See Ivey v. Audrain Cnty.,* 968 F.3d 845, 848 (8th Cir. 2020).   The right to receive medical treatment encompasses the right to mental health care.   *Winters ex rel. Estate of Winters v. Ark. Dep't of Health and Human Servs.,* 437 F. Supp. 2d 851, 898 (E.D. Ark. 2006) (citations omitted).

To succeed on this type of claim, a plaintiff must demonstrate that he had an objectively serious medical or mental health need and that the defendant actually knew of but deliberately disregarded that need.   *Id.* (citing *Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020)).   "Deliberate indifference may be demonstrated by prison guards

---

[7] Nothing in the summary judgment record indicates when Newman was convicted of a crime, so the Court assumes for the sake of argument that Newman was a pretrial detainee during the time period relevant to his Complaint.

13

who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citation omitted).   Further, "[m]ere negligence or medical malpractice . . . are insufficient to rise to a constitutional violation."   *Id.*

### 1.  Mental Health Care

The only medical care provider named in the Complaint is Nurse Hollis.   When Newman was initially booked into the BCDC, jail medical records indicate that he was given the medications he was already prescribed at the time.   (Doc. 42-10 at 1). Although Newman maintains there were many occasions when he did not receive his medication, he does not assert that Nurse Hollis was personally involved in any way in depriving him of these medications.   Newman was housed in a cell by himself in the booking area of the jail where he could be frequently monitored.   *Id.*

At the request of Nurse Hollis, Newman was initially screened by OG staff member Vrellaku on July 1, 2019.   (Doc. 42-4 at 2–4).   She noted his medications were Zoloft and Prazosin and assessed his suicidal thoughts as "mild" and his risk of self-injury to be "none."   *Id.*   Vrellaku recommended that Newman be seen at OG for medication management.   *Id.* at 4.   Newman was then comprehensively evaluated by Dr. Berke on July 24, 2019.   (Doc. 42-9 at 17).   Dr. Berke concluded that Newman's overall risk rating for harm to himself or others was low.   *Id.* at 17-19.   She recommended that Newman be treated with medication, and he was prescribed Depakote, Prazosin, Quetiapine (Seroquel), and Sertraline (Zoloft).   *Id.* at 22 & 27.   On August 13, 2019, OG records

indicate that Newman was seen by APN Reed.   *Id.* at 24–25.   Newman told her that he was satisfied with the medications he was currently prescribed.   *Id.* at 27.   After her assessment, APN Reed continued Newman's current prescription for Depakote and Sertraline (Zoloft) and increased his Seroquel and Prazosin prescriptions.   *Id.* at 30. APN Reed concluded that Newman was "not thought to be a danger to self or others at this time."   *Id.*

Newman contends that Nurse Hollis did nothing in response to his grievances and requests concerning his mental health issues; however, the undisputed evidence in the record shows that this is false.   Nurse Hollis ordered that Newman be evaluated by mental health personnel at OG on at least three separate occasions while he was in custody.   No reasonable jury could find that she was deliberately indifferent to his mental health needs, and therefore, she is entitled to summary judgment on this claim.

As to the BCDC officers' alleged deliberate indifference, Newman contends that Sergeant Beck, Officer Dunford, and Corporal Raymond refused to put him on "suicide watch" though he told them repeatedly that he was suicidal.   The undisputed facts show that Newman was placed in a cell close to the booking area so he could continually be monitored by jail staff.   Further, the evidence shows that jail staff were responsive to Newman's mental health concerns, as they arranged for him to be seen by the jail's medical staff, who, in turn, referred him to outside mental health providers.   No reasonable jury could conclude that these officers acted with deliberate indifference when Newman was evaluated and treated in accordance with the recommendations of mental health professionals.   *Cejvanovic v. Ludwick*, 923 F.3d 503, 507 (8th Cir. 2019)

15

("treatment complaint did not establish deliberate indifference"); *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) ("in face of medical records indicating" adequate treatment was provided, "an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment").   Accordingly, Sergeant Beck, Officer Dunford, and Corporal Raymond Defendants are also entitled to summary judgment on this claim.

### 2.   Medical Care after the July 26, 2019 Incident

Newman maintains he was not provided with adequate medical care after jail officers used excessive force against him.   He claims he was not seen by medical personnel until two to four days after the incident occurred.   When he was eventually seen by Nurse Hollis and APRN Clifton-Jones, Newman told them his forehead was throbbing and there was a big lump on his head.   At most, the record establishes that Officer Dunford and Corporal Raymond were negligent in failing to notice that Newman should have been seen by medical personnel more quickly.   Negligence is not the same as deliberate indifference.   *Allard v. Baldwin,* 779 F.3d 768, 772 (8th Cir. 2015) (to show deliberate indifference plaintiff must show something more than gross negligence).   "The Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish."   *Jenkins v. Cnty. of Hennepin,* 557 F.3d 628, 633 (8th Cir. 2009). Further, inmates who allege a "delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that [these] delays adversely affected his prognosis."   *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (quotation and citation omitted).   Here, there is neither evidence that an acute or

16

escalating situation existed nor evidence that any delay in treatment adversely affected Newman's prognosis.   Defendants are entitled to summary judgment on this claim.

### 3.   Official-Capacity Liability

An official-capacity claim is considered a claim against the employing governmental entity—in this case, Baxter County.   *Crawford v. Van Buren Cnty.*, 678 F.3d 666, 669 (8th Cir. 2012).   "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise."   *Corwin v. City of Independence,* 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted).

The gist of Newman's official-capacity claim as to denial of medical care is that the Defendants failed to follow the County's policies regarding placing inmates on "suicide watch" and requiring that inmates be immediately examined by jail medical staff after a cell extraction.   Newman does not point to any unconstitutional policy or custom or to any deliberately indifferent failure to train or supervise. "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is *caused* by a government's policy or custom."   *Gladden v. Richbourg,* 759 F.3d 960, 968 (8th Cir. 2014) (emphasis added) (quotation and citation omitted).   As Newman fails to allege that any policy or custom of Baxter County caused him to suffer injuries, this claim is without merit and will be dismissed on summary judgment.

### B.   Excessive-Force Claim Against Defendants Raymond and Dunford

The objective reasonableness standard applies to excessive-force claims brought by pretrial detainees.   *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).   "[T]he

defendant's state of mind is not a matter that a plaintiff is required to prove."  *Id.* at 394. A detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable."  *Id.* at 396.   The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'"  *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).   "[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

*Id.* (citing *Graham* 490 U.S. at 396).

This determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  *Kingsley*, 576 U.S. at 397.   "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'"  *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective.   *Id.* at 398-99.

With respect to Officer Dunford's involvement in this incident, she asserts by affidavit that she did not participate in the cell extraction and did not enter Newman's cell

after he threw urine on her.   (Doc. 42-11 at 2).   While Newman initially asserted it was

Officer Dunford who tased him, he testified in his deposition that that he was not certain

she was involved in using the taser.   (Do. 42-8 at 51, 55 & 57).   He only saw her "walk

out" with a taser.   *Id.*   Defendants do not deny that a taser was used on Newman during

the cell extraction, but they claim Deputy Foster used it, not Officer Dunford.   (Doc. 42-5

at 2-3).   Given these facts, when viewed in the light most favorable to Newman, no

reasonable jury could find that Officer Dunford used excessive force against him.   At

most, Newman suspects Officer Dunford might have had a role in the incident, but he

cannot positively identify her as being involved and would not be able to testify at trial that

she tased him.   By contrast, Defendants affirmatively state that she was not involved and

that a different officer (who is not a party to this suit) was responsible for tasing Newman.

Given the facts in the record, the excessive-force claim against Officer Dunford will be

dismissed on summary judgment.

　　　With respect to Corporal Raymond, however, genuine, material disputes of fact

preclude summary judgment.   Newman claims that he did not resist being placed in

handcuffs immediately after he threw urine on Corporal Raymond.   Newman testified

about the incident as follows:

> I threw it in his face and then caught the wall.   I turned around, put my
> hands behind my back.   He proceeded to throw me on the ground, and
> then when he got on top of me, he beat me in the top of the head for a good
> minute and a half.

(Doc. 42-8 at 51). Newman insists that when he went from the wall to the ground, his

"hands were behind [his] back the whole time" and he did not resist in any manner.   *Id.*

at 58.   But Corporal Raymond tells a different story.   He claims that after Newman threw

urine on him, Newman struggled and refused to be handcuffed.   (Doc. 42-5 at 2; Doc. 42-12 at 2-3).   According to Corporal Raymond, Newman's compliance was gained only after he was drive-stunned in the leg—twice.   *Id.*   Given the conflicting testimony and without the benefit of a videorecording of the incident, there remains a triable question of fact as to the reasonableness of Corporal Raymond's use of force against Newman.

### 1.   *Qualified Immunity*

Determining whether a defendant is entitled to qualified immunity requires a two-step inquiry.   *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012).   First, the Court must determine whether the facts demonstrate a deprivation of a constitutional right. Second, the Court must consider whether the implicated right was clearly established at the time of the deprivation.   *Jones*, 657 F.3d at 1161.   To do this, the Court "must . . . examine the information possessed by the governmental official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law." *Langford v. Norris*, 614 F.3d 445, 461 (8th Cir. 2010).   In other words, the Court must ask whether the law at the time of the events in question gave the officer "fair warning" that his conduct was unconstitutional.   *Hope v. Pelzer*, 536 U.S. 730 (2002).   If both parts of the test are satisfied, then the officer in question is not entitled to qualified immunity.

Here, the Court has found a genuine issue of material fact as to whether Corporal Raymond's use of force against Newman violated his right to be free from cruel and unusual punishment under the Eighth Amendment.   In addition, it was clearly established

20

in 2019 that an officer's use of gratuitous, excessive force against a detainee who was not resisting or being aggressive was unconstitutional.   *See Edwards v. Byrd,* 750 F.3d 728, 732 (8th Cir. 2014); *United States v. Miller,* 477 F.3d 644, 647-48 (8th Cir. 2007) (holding that kicking and stomping on an inmate without just cause or reason would violate the Eighth Amendment).   Though Newman's act of throwing urine on Corporal Raymond was certainly aggressive, Corporal Raymond's subsequent use of force may have been excessive if Newman did not resist being placed into handcuffs, and in fact immediately faced the wall of his cell and placed his hands behind his back in a compliant fashion—as he claims he did.   Though Corporal Raymond disagrees with Newman's recitation of these facts, the jury must be tasked with deciding which of the two disparate versions of the events is credible.   Accordingly, based on the record before the Court, Corporal Raymond is denied qualified immunity.

### 2.   *Official-Capacity Liability*

Newman alleges that Corporal Raymond failed to follow the BCDC's use-of-force policy, but Newman does not argue that the policy itself was the moving force behind any constitutional violations he may have suffered, nor does he allege that the County failed to adequately train or supervise officers on the use of force.   In addition, he does not claim that a failure to train was the moving force behind any constitutional violations.   In view of these undisputed facts, Newman has no viable claim for official-capacity liability against Baxter County on the use of excessive force.   Summary judgment will be granted to the Defendants on this claim.

### III.     CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Doc. 40) is **GRANTED IN PART AND DENIED IN PART.**   The Motion is **GRANTED** with respect to Newman's medical care claims, his excessive-force claim against Officer Dunford, and his official-capacity claims.   All claims against Officer Dunford, Sergeant Beck, and Nurse Hollis are **DISMISSED WITH PREJUDICE.**   The Motion is **DENIED** with respect to the individual-capacity excessive-force claim against Corporal Raymond.   This claim remains for trial.

**IT IS SO ORDERED** on this 13th day of May, 2021.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE